Good morning your honors. Michael Magnuson along with co-counsel Jack Carroll representing the appellant Mr. Mincey. We have some kind of a division of labor here and I do have a question about whether the court wants us to address the three issues that were not certified for appeal but which the court requested that appellee address and we're prepared to address. I'm assuming that at least one member of the panel wanted to hear argument on that because there was an order asking the state to respond to those so I think it would be safe to assume that those should be addressed. Okay and so we have a little division of labor. So are you addressing the certified issue? I'm going to address the and I don't want to repeat the arguments that were made in the briefs. The this has to do with the issue of exclusion of the evidence that Sandra Brown had a history of child abuse and drug use and as the court is aware the trial court resolved this by granting the prosecution's motion in limine to exclude that evidence. Why wasn't that evidence essentially cumulative? It was not cumulative. I would say that the offer of proof was fairly general but the the evidence was to be specific instances in which third-party witnesses could testify about what the Sandra Brown's acts with respect to her children on various prior occasions which we contend was evidence of habit or custom and which therefore would not be cumulative. It is true that there was a stipulation effectively that she had history as a general proposition of mistreating her children but that's totally different in our view from the specific evidentiary facts that would have been offered by the third-party witnesses on this subject and which goes to the entire defense of the case which was that the Sandra Brown was primarily responsible for the child's death. But why wasn't that improper character evidence? You're saying that it's habit as opposed to improper character evidence? Yeah I think the trial court characterized it as merely character evidence but I think it's more properly analyzed in terms of habit or custom. Habit refers to a person's consistent and repeated conduct in response to a recurring situation. That's what this evidence was going to be. That in response to her children misbehaving, Sandra Brown committed abuse, physical abuse, on her children on a consistent repeated basis under circumstances essentially fundamentally similar to what we had on the night of this. But as Judge O'Scanlan noted that's that was already stipulated to that she abused her children so why why would there have to be particular instances delineated in order to supplement that stipulation? I think we cited some cases in the in the brief on the subject that a mere stipulation just doesn't have the same evidentiary effect in front of a bland statement and to the effect that the Ms. Brown has a history of child abuse blah blah blah it's just not the same as somebody coming in and describing those instances in front of the jury. So we see that as an important distinction. There's a real risk of painting the the mother in a very improper character evidence. How do you how do you walk that fine line? Well I think that's the task of the trial court. The trial court resolved the issue by saying it's improper to delineate the each individual circumstance and rather address it with a stipulation. Well yes and of course we believe that that stipulation was incorrect and fundamentally incorrect and a denial of constitutional right of due process and Sixth Amendment right to confront witnesses but the task. What witnesses could you not confront? Well the essentially it's the evidence that Sandra Brown had committed these acts on testimony come in and be presented in front of the jury. That's not a confrontation clause issue. Well I the we couldn't get I mean they couldn't get Sandra Brown to testify obviously because of Fifth Amendment issues. So the the way to get some of that evidence of instead of having it come from the party witnesses is essentially the way to get that testimony in and to what I would call confronting the facts with respect to Sandra Brown even if it isn't Sandra Brown testifying herself. That's a due process issue of anything right? Well that's certainly due process issue. I believe it spills over into Sixth Generally when you've been deprived of the right to cross-examine someone who's testifying against you. Right, right. If I could turn to the one of the issues that was not certified and then hand this over to Mr. Carroll. The we have three issues and one of them that I'm going to address is claim 16k which was the failure to move this is an IAC claim failure of trial counsel to move to exclude law enforcement statements on the tape the audio tape that was played to the jury. There were three different interviews by the police and trial counsel permitted all three of them to be played in their entirety. So let me ask what's the prejudice there? Didn't you get instructions from the judge with in response to I think all three of the there were three tapes in response to all three there were admonishments to the jury regarding the issue of some of the some of the statements by police officers being inadmissible. Those admonishments did not specify which things were inadmissible and which were not. The prejudice in this situation arises from what we would see as the inadequacy of those admonishments to solve the problem of such overwhelming statements going in front of the jury that were both inadmissible as hearsay and not truthful and highly prejudicial. We have for example over 20 instances in which the sheriff's deputies told Mr. Mincy he was lying. So essentially the jury is battered over and over with repeated statements by police officers who are of course trusted and trustworthy saying that this individual was lying to them. Didn't defense counsel make a calculated decision to play the entire tapes of the interrogation so that the jury would be able to judge for itself the context in which these statements were made and why is why do we get to second-guess that tactical decision? Well, yes. The trial counsel said let the jury hear it all because the intent issue is so critical. This was trial counsel's rationale and that's fine if you're talking about Mincy testifying and let's hear Mincy explain the whole thing. That made sense. There's no way you can look at this as a as a tactical decision to hear all the provocative police officer comments to and about Mr. Mincy and folding all of into this as well. Perhaps the thinking was that the jury would be so turned off by the tactics that were used by the police that they would not credit the statements that were made by Mr. Mincy. It's the Supreme Court has said that you know the tactical decisions that are made by counsel are virtually unchallengeable. How do we get around that? I mean I'm aware of the the approach which is as a general proposition we credit the tactical decisions of trial counsel but in numerous it has to be analyzed concretely and in numerous instances courts have found that purported tactical decisions are in fact fall below the standard of care and and for a different reasons that depends on the facts in the case what are ostensibly tactical decisions are found to be inadequately analyzed. You can't make a strategic decision about something for which there is no rational strategy and that's what we've got here. Yeah thank you. I'm going to hand this over to Mr. Carroll. Good morning your honors. I'm Jack Carroll lead counsel for the petitioner and I'm going to address the issue of whether a certificate of appealability should issue on two claims. The first one is ineffective assistance of counsel regarding a failure to engage an independent pathologist on the cause of death issue. The other issue I'm prepared to discuss is the ineffective assistance of counsel on the decision to call Dr. Anthony Oliver for the defense. That's how I read the order. The actual. What was the first one you said? The failure to engage an independent pathologist to look at the cause of death issue. On that particular issue I wanted to address a couple things in the supplemental brief by the appellee. In order to obtain relief on that claim the petitioner does not have to prove that there were amphetamines in the victim's system. This under Strickland there simply has to be a question as to whether or not the failure of the ineffective performance of counsel actually undermines confidence in the verdict. This is not an actual innocence case. In fact the evidence is not there. The body was cremated shortly after the the autopsy was taken. However. Counsel just so I understand your argument are you saying that if defense counsel had called an independent pathologist that pathologist would have likely been able to present evidence that there was there were there was a presence of amphetamines in the system of the child? Well what the if defense counsel had first of all engaged an expert then defense counsel would have learned that there was no basis for the coroner's testimony regarding the metabolic acidosis. If that expert didn't had gone on the stand he would have been able to testify that based upon the data and that exists from the from the autopsy combined with the the statements of Mr. Mincy a more likely cause of death than metabolic acidosis in the combination of electrolyte imbalances would have been amphetamine overdose. Okay so was there a declaration from a pathologist that accompanied? It's a declaration from Dr. Stewart Pablo Stewart that Apollices is not a pathologist. Right. If that's the case I that's my fault this was back in 2000 when we got it and I assumed. Is he a pathologist? What's that? Is Dr. Stewart a pathologist? I he has done expert testimony in these cases I don't know if he's certified pathologist. It doesn't take a pathologist to look at the the blood work in the in the bodily fluid work to see that there's no test done for acidity in the blood therefore there's no basis to argue that that was a contributed to a cause of death. And I mean that's basically and if we need I'm sorry your honor go ahead well I was going to say that we don't have an evidentiary hearing here we had limited funding and we we got who we could get to basically say we want an evidentiary hearing with Dr. Stewart's testimony was in the motion for it was the the declaration was sent in the motion for an evidentiary hearing basically saying there's some serious questions here about whether the forensic evidence standard is whether or not there's a at least for prejudice is whether or not there's a reasonable likelihood that the outcome would have changed right so if you had a Dr. Stewart testifying against a certified pathologist what do you think the likelihood is that the outcome would have changed? I think any medical doctor could have looked it could have eviscerated Dr. Root's testimony at trial but as basically not having any basis in any of the test results that he made. I mean a pathologist may have been more effective I don't think we're saying that Dr. Stewart was the doctor that would be called we were using Dr. Stewart to say we need to have an evidentiary hearing on this. Your COA was based on the fact that Defense Counsel did not engage an independent pathologist but you didn't offer any evidence of what an independent pathologist would have opined. That's the difficulty. All right I mean if this is going to turn on whether or not Dr. Stewart is a certified pathologist I don't see that as really being a material issue. The issue is should there have been an evidentiary hearing regarding the basis of Dr. Root's testimony regarding cause of death and  investigation into the underlying basis of that of that testimony and as I said any medical doctor any physician would have been able to see that. All right you have exceeded your time. Do you want to briefly address Dr. Oliver? Yes Your Honor and remember what the panelists said regarding strategic decisions. I think if that is standard is applied to Dr. Oliver it cannot be done in the defense counsel Mincy said was his reason for doing it for calling him. His reasoning was that he wanted to get into evidence the what he thought was the pivotal statement from Dr. Oliver that Mr. Mincy did not intend to kill the child. That's what he said and I would just simply say that the prohibition against 20-20 hindsight in these situations is somewhat of a two-way street and you have one would have to look at what Mr. Mincy said he intended to do and what he did and the basis for saying desperate times calls for desperate measures but let's look at the record. Why was everything so desperate at that point when all we had were were witnesses that should whose testimony should not have been a surprise to anyone and then you look at the performance of Dr. of Mr. Mr. Whitney. He got what he supposedly wanted very early on and then went into this what can only be described as a grandiose adventure going through this unbelievably damaging report that Dr. Oliver had done regarding Mincy and going through line by line and telling the jury exactly what was going to be said with a report that was only going to be used at penalty if they got. Thank you counsel we'll hear from the stage. Morning your honors Meredith White for respondent. I'm a one-woman show so I'll go ahead and address everything from first the certified claim and then the COA issue. With respect to the certified issue Mincy's claim that his right to present a defense was infringed by a standard and lawful application of California rule of evidence 352 should be denied because the balance of interests in this case clearly favors the trial courts decision to exclude the contested evidence and I want to first respond to the two questions asked by your honors. One was why wasn't this cumulative and it was cumulative the only potential relevance of this evidence was to show that Sandra Brown's past incidents of abuse demonstrated that call it character call it habit or custom either way that she acted in conformity with that character trait or habit or custom on the night of the murder so the only relevance was as to whether or not she abused James on December 22nd and 23rd that was conceded by both parties she was charged as a co-defendant in the case and the jury knew that so this Wendy testified that both Brown and Mincy had abused her and had abused James that night so again the only potential relevance of this evidence was as to who whether or not Sandra Brown acted in conformity with that trade on the night in question everybody agreed that she participated in the abuse that night the evidence was necessarily cumulative the same is true with respect to the the drugs in her system it was stipulated that she had amphetamines in her system her prior drug use could only have been relevant as to whether or not she acted in conformity with it on the night in question and it was stipulated everybody knew she had amphetamines in her system and to answer excuse me to answer judge Rawlinson's question isn't this an admissible character evidence it absolutely is this is this is quintessential 1101 evidence that same rule is embodied in the federal rules in rule 404 this was let's try to dirty up Sandra Brown to show that you know she had a character trait for abusing her children I don't think anyone disputes that she was an abusive mother so it was absolutely character evidence it's now on appeal been couched as habit or custom I think the offer of proof at trial was insufficient to show that the offer of proof at trial was simply that there were unnamed witnesses out there who would testify that on prior occasions she had abused her children that is not sufficient to show a habit a sort of unthinking response to a situation either way the judge ruled the evidence inadmissible under California rule of evidence 352 which was the absolutely appropriate ruling I think the fact that it's also inadmissible as inadmissible character evidence and that it doesn't meet the standard for habit or custom demonstrates that the state's interest in excluding this type of evidence was that much stronger that there are numerous rules of evidence which would have warranted excluding this evidence and and as this court has said in Perry versus rushing the appropriate approach to this issue is a balancing test and the state's interest as embodied in rule 352 it's difficult to overstate it the same rule exists in the federal rules of evidence in 403 it would consume an undue amount of time confuse the issues or is unduly prejudicial and this evidence met all of those so the state's interest was very high and then compared to the five chia factors I think it's very clear that in the interest in this case way in favor of the state the probative value the on appeal the defense has been characterized as that this idea of relative culpability was central to the defense I think a sort of more complete view of the record below shows that that was not a central issue for the defense this the defense claim was this was a misguided attempt at discipline and that Mincy experienced an explosive rage which was supported by the testimony of his two psychologists that said he had intermittent explosive disorder and that as a result of that explosive rage he beat the child for 24 to 48 hours and that because of his mental disorder he had no intent to kill and no intent to torture the idea that everybody was trying to pin this on Sandra Brown is just a misrepresentation of what the actual defense was at trial so I don't think that this particular evidence regarding Sandra Brown was central to one of those issues in addition the reliability and whether or not the evaluation by the jury it's important to keep in mind the offer of proof at trial here and the offer of proof was one vague statement that there were witnesses out there who would testify about prior incidents of abuse but it's not clear how reliable those witnesses were it's not clear that the jury was would have been capable of evaluating the evidence especially in light of the trial court's ruling that if he was going to allow evidence of Sandra Brown's prior incidents of abuse he was also going to allow evidence of Mincy's prior incidents of abuse of the children and the prosecutor noted that for every witness they had who said Sandra Brown beat these children on a prior occasion the prosecution had another witness who was going to say Mincy beat the children on a prior occasion this would have devolved into a parade of witnesses all basically arguing over who had a greater propensity to abuse the children on the night in question when nobody contested that both people abuse those children on that night I think I've already spoken to the fact that it was cumulative and not a major part of the attempted defense so when viewed in light of the Chia factors and the incredibly strong state interest it's clear that the trial court here made the right decision and that none of the defendants constitutional rights have been violated I want to move to the uncertified claims the first the cause of death issue dr. Stewart is not a pathologist he is a psychiatrist he has performed some evaluations of cause of death where it involves drug use he his predominant area of expertise is substance abuse so I do think that that's relevant here because the opposing counsel had excuse me mr. Mincy has to make a sufficient showing that one there was deficient performance and two there was prejudice and dr. Stewart's declaration doesn't come anywhere close to that one he opines that the cause of death was overdose of amphetamines even though everybody agrees that to this day there's no evidence that there were any amphetamines in the child system now whether or not those tests were as good as they later became the fact that the doctor says the cause of death is amphetamine overdose and we don't know that the child had amphetamines in his system I think that undermines the credibility of that declaration in addition to that counsel may ask in your briefing I don't think you address the Duncan case and the Baylor case at least adequately I'd appreciate how you would distinguish those cases in which we did find ineffective assistance of counsel no I'm not familiar with those cases is it regarding cause of death yes I guess I'll give it a give it a shot I think the the cause of death here first of all this is an ineffective assistance of counsel claim it is not a false testimony claim and so the important thing is to go back to the best of our ability in time to look at what Defense Counsel knew at the time he made the decision in this case the decision not to further investigate cause of death and what he knew at the time was that the coroner indicated that his the cause of death of the boy was an excuse me extensive blunt force injuries over a matter of hours that would have been consistent with all of the physical evidence namely that the child was head-to-toe in bruises and abrasions it for the coroner to conclude that that that contributed to his death would have been the obvious conclusion I think everybody looking at the evidence would have assumed that yes the the very extensive beating suffered by this child contributed to his death he the other important point here is this notion that the corner testified metabolic acidosis was the cause of death he did not testify to that he testified that the child suffered a number of complications which arose from the beating one of which was metabolic acidosis and that was the basis for the district courts rejection of the false testimony claim below which that's an important distinction because dr. Stewart's declaration seems to assume that dr. Rue testified metabolic acidosis killed the child that is not what dr. Rue testified to and that was not the conclusion reached in his autopsy protocol so metabolic acidosis was noted as one complication but it was the beating itself which killed the child this is important when viewing the ineffective assistance of counsel claim because it it was the information available to defense counsel at the time he made the decision regarding whether or not to pursue additional investigation on cause of death he knew that the corner was going to testify that the beating killed the boy and that was the obvious conclusion and again it was consistent with the physical evidence he also knew that the corner had tested the child for the presence of drugs and that none had been detected there was no reason for defense counsel at that time with that information to question beyond that the the coroner's cause of death analysis and that is is I think the fundamental question here regarding deficient performance is what counsel knew at the time he made the decision he could not have known that the tests for tissue analysis and urine analysis later would get better he could not have known that again dr. Stewart's sort of opining that this was an amphetamine overdose ignores the fact that we still do not know that there were amphetamines in this child's what did he base what did dr. Stewart base his opinion on the fact that there was a there were there was a drug overdose what did he base that on there there was some indication in the protocol that the child suffered cardiac arrhythmia so I some heart I'm not sure if it's quite equivalent to a heart attack but something similar which can be in a young child caused by a drug overdose but again it I think the declaration itself is insufficient because it fails to explore what else may have contributed to some of the heart issues the dr. root testified that the child went into shock as a result of the the beating that lasted for 24 to 48 injuries excuse me 24 to 48 hours so the declaration is insufficient on its face to the beating lasted for 24 to 48 hours that's correct I'm sure it wasn't constant I guess we don't know what we know is dr. root testified that the injuries he observed during the autopsy occurred within roughly you know a day to two days prior to the death of the moving moving on to the sheriff's statement the jury was instructed I believe a total of five times once before each interview was played once during final instructions to the jury and I think once during one of those interviews the judge reminded the jury and admonished them again that and it wasn't just these are not offered for the truth of the matter that the judge stated explicitly that the detectives had lied about the evidence and that they were not to accept whatever the detective said about the evidence to be true that they were doing that to elicit information from Mincy and and again as judge Rawlinson pointed out this was a tactical decision by defense counsel he wanted to be able to argue that the admissions that Mincy did make during those interviews were influenced by the coercive nature of the questioning and he did make admissions those admissions were coming in and defense counsel needed a way to explain them away and and finally on dr. Oliver this again is is a quintessential tactical decision dr. Oliver did not have a favorable opinion of Mincy that was clear but that was also part of the tactic the tactic was there there was a lot of unfavorable information coming in about Mincy including the death of a five-year-old boy by virtue of a 24 to 48 hour beating Mincy admitted in his interview with police officers that he forced the child to taste his own feces as a potty training mechanism defense counsel was reasonable in assuming the jury was not going to view mr. Mincy favorably dr. Oliver did not view mr. Mincy favorably and the tactic here was if I can get this expert who also dislikes mr. Mincy intensely to testify that he still did not have an intent to kill the child I can save his life because without an intent to kill he could not have been convicted of the special circumstance and the death penalty was off the table so this and and mr. Whitney's explanation it's clear he understood this was risky that this was a prosecution expert that again that he disliked mr. Mincy he explains in his not like Mincy you will hear unfavorable things from him but that even he agrees that mr. Mincy did not have an intent to kill the child so this is again a quintessential tactical decision that had that had potential risks and potential benefits and trial counsel made that eyes wide open he'd conducted a follow-up interview with dr. Oliver prior to calling him as a did in fact testify that he did not have an intent to kill and further the real I think the the alleged harm of dr. Oliver's testimony is as to the intent of torture and he did testify that Mincy had an intent to torture it's important to remember that in the context of the trial the intent to torture was relevant for the first-degree murder conviction but in order to find the special circumstance true again the prosecution had to prove an intent to kill and so mr. Whitney was reasonable in placing more emphasis on avoiding the death penalty and trying to undermine the special circumstance intent to kill finding and also within with regard to intent to torture I think the evident the other evidence that Mincy intended to torture the child shows that dr. Oliver's testimony on this would not have resulted it's not reasonably likely that it would have resulted in a different result the number of blows dr. who testified that there were hundreds of blows to this child that the length of the beating again was 24 to 48 hours that there was tearing to subdural tissues the force of which to cause those injuries was akin to the injury seen in car accidents dr. root explained that part of the the medical problem suffered by James were because he was breathing heavily and crying which is what you would expect of a child in these circumstances I think also relevant to this is the age of the child the size of the child the the use of belts and a board to beat the child again that he forced him to eat his own and that he fundamentally lacked remorse from the time police officers showed up to find James one of the other points was James's younger sister was also beaten on this occasion she was a four-year-old and obviously her beating was extensive as well but in comparison there was a fundamental difference between what she experienced and what James experienced and that demonstrates that the intent to do harm to James was fundamentally different and I think in light of all of that physical evidence it's not reasonably likely that the jury was going to reach a conclusion that Mincy did not intend to torture this child so I think unless the court has any further questions we're prepared to submit counsel I noticed that judge Gutierrez granted the writ with respect to the special circumstances and the state is not cross-appealed I assume that the death penalty is off the table now they for purposes of the appeal yes there was an instructional issue with regard to the special circumstance on torture it's my understanding and again this is a decision that that ultimately is made by the San Bernardino District Attorney's Office but that they do intend to retry the special circumstance and that is in large part because as it is now Mr. Mincy is is guilty of first-degree murder which carries a 25 to life sentence he's currently eligible for parole having already served 25 years so my understanding is that they do intend to retry the special circumstance to secure either a life without parole sentence or a death sentence and you're satisfied that can be done in the context of what judge right yes it is my understanding that where the special circumstances overturned for an instructional error which is what happened here that in your position is it can be retried on that issue yes that's my yes all right can be right on that issue thank you thank you your bottle thank you your honor I just wanted to address a couple of things that were brought up by the appellee the I think there's a conflation here between dr. Stewart's opinion that a more likely cause of death was amphetamine ingestion as and then and his statement that the forensic evidence the test results which are basic black and white do not support dr. roots testimony regarding cause of death and with respect to the bruising of the child it was it was awful all the pictures were shown to the jury but there were no more broken bones there were no internal injuries that would have caused death the issue is whether all of that beating and spanking killed the child which is the fundamental crux of the prosecution's argument to opposing counsel's observation that there was there was no clinical evidence of drugs in the child system well the the child's blood was never testified every other person who came near that in that event had their blood tested including the two defendants the child's urine was tested and that was shown to be that came up negative but whether or not it would have been negative there was the paper chromatography test it was a judge excuse me Irving root the coroner testified that that he should have had a no result based upon the amount of urine that he used and I mean and the the evidence has been destroyed since then so no there is no evidence of amphetamine presence of amphetamines physically there's the testimony excuse me the statement of mr. Mincy which was used against him to show he was a liar that that's what happened he was given the child was given the amphetamines but how can we rely on an expert opinion that says that was the cause of death if there is nothing to support that statement we don't need to rely on whether or not there's an alternative cause of death in order to find ineffective assistance of counsel we're not here to show that that's what killed the child we're here to see whether to decide whether defense counsel should have made a decision I don't know if there was any decision made we have no evidence at all about what defense counsel was in defense counsel's mind about whether or not he should question dr. roots yes at the time of trial what in the record should have alerted defense counsel that a likely cause of and the protocol showing the absence of basic basic indications that would have shown that metabolic acidosis electrolyte imbalance and shock would have caused death in this situation and since intent to kill is so important how can someone of mr. Mincy's limited intellectual capabilities assume that spanking over a course of many hours would have caused the death and with respect to whether or not metabolic acidosis was a cause of death if the focus is only on dr. roots opinion it's very blurry to try to figure out what he's saying but if you look at the prosecution's closing argument he focused on metabolic acidosis and the defense did too so that's that's where where they were going with that I have a vague feeling I haven't addressed your primary question but I mean lawyers are not physicians and I looked at this I didn't see this I I'm sorry you're on it okay you need to just get a licensed physician to look at this or somebody who has some ability to see that and say hey there's the pH level was never tested how can you say there was an acid base imbalance if you don't test for it that's the basis of this claim is dr. root it's basically winged it and no one had the expertise to see that that's what he was doing all right thank you counsel thank you thank you to both counsel to all three counsel the case just argued is submitted for decision by the court that completes our calendar for today we are on recess until 9 a.m.
judges: O'scannlain, Fernandez, Rawlinson